UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TERRY L. THOMPSON,<br><br>Plaintiff,<br><br>vs.<br><br>JOSH KLIMEK, Unit Manager; DIANE ROMKEMA, Case Manager; JERRAME LARSEN, D-H-O Hearing Officer; and LEE KAUFENBERG, Correctional Officer;<br><br>Defendants. | 4:16-CV-04071-KES<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Plaintiff Terry L. Thompson is an inmate at the South Dakota State Penitentiary (SDSP) in Sioux Falls.[1] Mr. Thompson filed a pro se civil rights lawsuit under 42 U.S.C. § 1983, and amended his complaint twice. Docket Nos. 1, 3 and 25. A protective order staying discovery is in effect. Docket 37. Defendants have moved for summary judgment. See Docket No. 52. Also pending are defendants' motion for relief from order (Docket No. 68), Mr. Thompson's motion supporting factual positions (Docket No. 77) and Mr. Thompson's motions for preliminary injunctions (Docket Nos. 79, 81 and 85). These motions were referred to this magistrate judge for a recommended disposition. See Docket Nos. 84 & 85; 28 U.S.C. § 636(b)(1)(B).

---

[1] At the times of the events giving rise to Mr. Thompson's claims, however, he resided at the Mike Durfee State Prison (MDSP) in Springfield, South Dakota. How and when he was transferred to SDSP does not form any portion of the basis of Mr. Thompson's claims herein.

## FACTS

### A. Claims in Mr. Thompson's Amended Complaint

Mr. Thompson's amended complaint indicates he suffered heart problems while housed at the Mike Durfee State Prison (MDSP). Docket 3 at 5. On January 19, 2016, a pacemaker was installed. Id. Three days later, on January 22, 2016, he sought medical care because he was not feeling well. Id. He alleges he was not given medical assistance but instead was written up for inappropriate contact with medical staff and put in the segregated housing unit (SHU) for 30 days. Id. at 6. Mr. Thompson claims he was not acting inappropriately with medical staff but having a heart attack. Id. While in the SHU, Mr. Thompson claims his heart failed three times. Id. at 5. Mr. Thompson claims defendants were deliberately indifferent to his serious medical needs and that he was subject to retaliatory discipline, all in violation of the Eighth Amendment.[2]

### B. Medical Records

In addition to long-standing heart problems, Mr. Thompson had a long-standing problem with anxiety as well. See, e.g. Docket No. 80 at pp. 4-5. Mr. Thompson has provided medical records documenting issues with chest pain and anxiety dating back to October 21, 2015. Id. at p. 1. Mr. Thompson's anxiety frequently manifested itself in feeling panicky, short of breath, and tightness of chest. Id. at pp. 4-5. Although Mr. Thompson was prescribed medication for both his heart condition and his anxiety, he often refused to take medications, stating he did not like to do so. Id. at pp. 5-6.

---

[2] The balance of Mr. Thompson's complaints was dismissed upon screening. See Docket 7.

In November, 2015, Mr. Thompson complained of chest pains and anxiety. Id. at pp. 27-28. At that time, prison medical staff did a complete metabolic blood test, administered a cardiac echo cardiogram, and a stress test. Id. These tests were within normal ranges. Id. A Holter monitor was placed on Mr. Thompson and removed on December 10, 2015.[3] Id. at p. 29. It was determined that Mr. Thompson had symptomatic brachycardia and required the installation of a pacemaker. See id. at p. 35. A surgery date was set for January 19, 2016. Id. at p. 32.

On January 18, 2016, Mr. Thompson reported to prison medical staff that he was feeling dizzy and experiencing chest pains. Id. at p. 32. He told staff he had passed out from dizziness when traveling back to his cell after recreation. Id. Prison staff transferred Mr. Thompson to the external hospital emergency room at Avera Sacred Heart Hospital in Yankton, South Dakota, for further evaluation of his heart symptoms. Id. at p. 31. A surgery appointment had already been arranged for Mr. Thompson to have a pacemaker installed the next day. Id. at p. 32. Therefore, he was kept overnight at Avera on January 18. Id. A pacemaker was surgically installed in Mr. Thompson on January 19, 2016. Id. at p. 33.

Mr. Thompson returned to the MDSP on January 20 and was kept in the acute infirmary. Id. The night of January 21, Mr. Thompson was kept in sheltered housing overnight. Id. He complained of dizziness on the 21st, but told

[3] A Holter monitor is a battery-operated portable device that measures and records the heart's activity (ECG) continuously for 24 to 48 hours. The device is the size of a small camera. It has wires with electrodes the size of silver dollars that attach to the patient's skin. See http://www.heart.org/HEARTORG/Conditions/HeartAttack/DiagnosingaHeartAttack/Diagnosing-a-Heart-Attack_UCM_002041_Article.jsp#.WZdUXmDruid - last checked August 18, 2017.

staff it was probably his anxiety as he was not experiencing chest pain or shortness of breath. Id. at p. 37. Mr. Thompson was noted to be crying about his stress level. Id. at p. 38.

Mr. Thompson returned to his regular unit the morning of January 22, 2016. Id. at p. 33. At this time, he was prescribed three 325-milligram tablets of APAP[4] for pain, to be taken four times per day. Id.

At 7:14 a.m. on January 22, 2016, Mr. Thompson reported to prison medical staff that he was experiencing pain in his incision site as well as anxiety related to that pain. Id. at p. 38. Prison staff placed Mr. Thompson in the infirmary for observation and notified mental health personnel that an assessment of Mr. Thompson's anxiety was necessary. Id.

Two hours later, at 9:21 a.m., Mr. Thompson was noted to have been resting quietly in the infirmary in no apparent distress. Id. at p. 39. His complaint at this time was the incision site for his pacemaker felt bruised. Id. Prison medical staff reviewed with Mr. Thompson his orders for pain medication and then allowed him to return to his unit. Id.

On January 24, 2016, at 4:58 p.m. Mr. Thompson was seen by prison medical staff because he was complaining of feeling dizzy and like his heart was pumping slow. Id. at p. 40. He would not allow medical staff to take his blood pressure. Id. He told medical staff he could not breathe, but he was observed to be having easy respirations at 18. Id. He was taken to the bathroom and returned, saying he just had his first BM in a week. Id. He sat by the open window and stated he felt more relaxed. Id. at pp. 39-40. At 8:17 p.m. that same

[4] The acronym APAP may refer to paracetamol (or acetaminophen), an analgesic drug.

night, Mr. Thompson was observed resting in the E-care room bed, laughing and joking with the DOC officers with no signs of distress present. Id. at p. 41. Mr. Thompson was returned to his cell in the SHU at this time. Id.

On January 26, 2016, Mr. Thompson saw medical staff in the SHU. See Docket No. 80 at p. 42. He requested a soft diet because he stated that "when he eats certain food like potatoes and bread he feels like it goes down his throat really slow and that it 'scratches' his throat and all the way down and 'scratches' his heart." Id. He stated this feeling gives him anxiety and he wanted to see if a soft diet would help. Id. He denied any other pain or problems at this time. Id. He told medical staff he had eaten nothing but jello for the last 10 days because of this feeling.[5] Id.

At 1:20 p.m. Mr. Thompson reported he was having chest pain and dizziness. Id. Upon arrival at Medical, an EKG was obtained and faxed to Avera Heart Hospital, which indicated Mr. Thompson should be transferred to their facility. Id.

Mr. Thompson went to the emergency room at 2 p.m. on January 26, 2016, and returned to the SHU at 5:08 p.m. Id. at p. 49. An EKG was taken on this same date. Id. at p. 48. Records from Avera Sacred Heart Hospital reveal Mr. Thompson was brought to its emergency room with complaints of chest pain. Id. at p. 45. Mr. Thompson was noted to have high anxiety, which exacerbated his pain. Id. While in the ER, medical personnel interrogated his pacemaker data and

[5] Mr. Thompson had complained on December 3, 2015, of a similar sensation. See Docket No. 80 at p. 17. He stated on that occasion he felt his throat was swelling and it was difficult for him to swallow. Id. No swelling in Mr. Thompson's throat was found upon examination. Id.

it suggested no bradycardic cardio events and no arrhythmias had occurred. Id. at p. 44. He was noted to have small left pleural effusion.[6] Id. at 43. Ice and heat applied to Mr. Thompson's left chest were recommended along with ibuprofen and colchincine.[7] Id.

On January 27, 2016, Mr. Thompson was told that medical staff would address his request for a soft diet when he had a follow up with his medical care provider. Id. at p. 49.

On January 29, 2016, Mr. Thompson was seen by medical staff while he was in the SHU. Id. at p. 50. He was complaining of mild incision pain at the site of his pacemaker surgery. Id.

On January 31, 2016, at 12:30 p.m., Mr. Thompson was brought to medical from the SHU in a wheelchair because he was complaining of dizziness and a "black out" episode. Id. at p. 51. Mr. Thompson also reported anxiety. Id. He told medical staff he did not fall or become unconscious, but that everything around him went dark for a second. Id. He reported only a small amount of pain in his chest. Id. Mr. Thompson's vitals were normal. He was returned to the SHU with instructions to notify medical staff if he had any continued symptoms. Id.

On January 31, 2016, during SHU supper rounds at 2:55 p.m., Mr. Thompson was observed sitting relaxed on his bunk. Id. at p. 52. He denied any chest discomfort and took his supper medications without difficulty. Id.

---

[6] Effusion means giving off liquid. Pleural refers to the muscles of the chest wall. The court interprets this finding to mean there was a small accumulation of fluid in Mr. Thompson's left chest wall muscle.

[7] Colchincine is an anti-inflammatory medication.

On February 2, 2016, Mr. Thompson was seen at SHU sick call round. Id. at p. 52. He complained of not being able to move his bowels. Id. Medical staff gave him Milk of Magnesia and instructed Mr. Thompson to drink plenty of water. Id.

On February 5, 2016, Mr. Thompson was seen for a follow up appointment at the Yankton Medical Clinic outside the prison. See Docket No. 58 at p. 11, ¶ 50; Docket No. 53-23. The cardiologist reviewed Mr. Thompson's pacemaker and decided its settings could be better optimized to be more responsive. Id. The cardiologist "increased his max sensor rate and decreased his lower rate limit to try to minimize atrial pacing." Id. The cardiologist reviewed the interrogation records of Mr. Thompson's pacemaker and found them "completely unremarkable." Id.

On February 8, 2016, Mr. Thompson was seen in follow up to his pacemaker adjustment. See Docket No. 80 at p. 57. He stated he was still experiencing intermittent dizziness, but had not experienced any further shortness of breath. Id.

On February 26, 2016, Mr. Thompson reported to sick call asking for medical shoes. Id. at p. 58. A general check up was conducted, including an EKG. Id. at pp. 58-59. Mr. Thompson reported at this time that he had light intermittent chest pains, but that he was not experiencing any pain at that time. Id. at p. 58.

On March 2, 2016, Mr. Thompson reported to prison medical staff he was having sharp chest pain for one hour. Id. at p. 62. An EKG was taken of his heart. Id. at p. 61. Medical staff noted Mr. Thompson appeared anxious and

moved about on the exam table. Id. at p. 60. During the time Mr. Thompson had sat in the exam room, he reported his chest pain had diminished. Id. He also reported he was starting a regimen of mental health medications the next day. Id. Medical staff arranged for Mr. Thompson's chart to be reviewed by an advanced-level provider. Id.

On March 9, 2016, an EKG was taken of Mr. Thompson's heart. See id. at p. 65. He was then seen by prison medical staff on March 10, 2016, complaining of cold symptoms (runny nose and cough). Id. at p. 67. Mr. Thompson complained of becoming dizzy and short of breath when passing through the metal detector in the cell hall. Id. at p. 64. He asked if the prison used high frequency radio transmitters because he felt such devices might cause his symptoms. Id. Mr. Thompson stated he may be having anxiety. Id. He indicated mental health personnel had started him on anti-anxiety medications. Id. Mr. Thompson said he felt fine when he was in his cell, it was only on leaving his cell he experienced symptoms. Id. Medical notes reflect he was smiling and not in distress, his breathing was even and unlabored, he conversed normally, and he was able to change bodily positions with no symptoms or difficulties. Id. at p. 63.

Mr. Thompson was seen by prison medical staff on March 24, 2016. Id. at p. 72. Mr. Thompson reported that, since his pacemaker settings were adjusted on February 5, 2016, he was no longer having any chest discomfort, dizziness or syncope. Id. He also reported mild improvement of his anxiety symptoms since beginning the medications risperidone and sertraline. Id.

## C. Disciplinary Action Against Mr. Thompson

While Mr. Thompson was in the infirmary on January 22, 2016, Rachel Pravacek, a female registered nurse at MDSP who was attending another inmate walked past Mr. Thompson in order to retrieve a towel. See Docket No. 53-10. Mr. Thompson said, "What's up, Rachel? I'm having anxiety problems right now." Id. Ms. Pravecek responded, "Yes, that is what I hear. The nurse is going to have mental health come up and talk to you." Id. Mr. Thompson said, "ok." Id. When Ms. Pravecek began leaving the infirmary, Mr. Thompson said to her while smiling, "What, you can't sit here and talk to me for awhile?" Id. Ms. Pravecek responded, "No, I cannot." Id. Ms. Pravecek continued on her way back to the inmate she was attending at that time. Id. When she left, Ms. Pravecek indicated Mr. Thompson was in no acute distress, resting comfortably on the bed, and being monitored by another nurse. Id. Following these events, Ms. Pravecek submitted an incident report detailing the above facts. Id.

Back at his unit, Mr. Thompson went to the Correctional Officers' desk in his housing wing and inquired whether Correctional Officer ("CO") Beach was working. See Docket No. 54 at p. 2. The correctional officers at the desk told Mr. Thompson it was not any of his business whether CO Beach was working. Id. Mr. Thompson stated to the officers at the desk, "Beach makes me smile." Id. Mr. Thompson did not inform the officers at the desk that he was experiencing any pain or medical issues at the time. Id. at pp. 2-3. When officers at the desk later informed CO Beach of Mr. Thompson's inquiry, CO Beach stated that Mr. Thompson had a habit of following her around when she is doing rounds and hangs around the desk when she is working there. Id. The information about

Mr. Thompson's inquiry as to CO Beach was provided to Officer Kaufenberg. Id. at p. 4.

For Mr. Thompson's comment to Ms. Pravecek and his comment about CO Beach, on January 22 he was placed in the Special Housing Unit (SHU) pending investigation of these events. See Docket No. 55 at p. 4. On January 25, 2016, defendant Lee Kaufenberg wrote up a disciplinary report charging Mr. Thompson with having violated Prohibited Act "M-5." See Exhibit 53-11. M-5 prohibits "making any unsolicited contact with or in reference to any non-inmate (writing notes or letters, making suggestive remarks or gestures, inappropriate touching, or seeking out personal information." Id.

On January 28, 2016, defendant Joshua Klimek met with Mr. Thompson to go over the disciplinary report with him. See Docket No. 56 at p. 4. Mr. Klimek offered Mr. Thompson "14 days DS" if he would admit the charges. Id. Mr. Thompson would not admit and requested instead that an evidentiary hearing be held. Id. Unit Coordinator Archambeau was assigned to assist Mr. Thompson with the hearing. Id. At no time during Mr. Klimek's meeting with Mr. Thompson did Mr. Thompson indicate he was in pain or in need of medical attention. Id. at pp. 4-5.

A disciplinary hearing was held on February 3, 2016, presided over by defendant Jerrame Larson. See Docket No. 55 at p. 2. At the hearing, Mr. Thompson did not deny the allegations, but excused them by stating he was coming down off drugs and was under a lot of anxiety and pain. See Docket No. 53-29; Docket No. 55 at pp. 4-5. The hearing officer found the charge

substantiated and gave Mr. Thompson 60 days in the SHU for these two combined statements. See Docket No. 53-29.

**D. Administrative Grievances**

On February 19, 2016, Mr. Thompson made an administrative complaint via a handwritten letter. See Docket No. 80-19 & 80-18. In his complaint, he alleged he fell over and almost died on January 18, 2016. See Docket No. 80-19. He recounted his pacemaker surgery and his discharge back to MDSP. Id. He then stated he sought medical attention at the nurse's station on January 21 due to pain, but he was merely sent back to his cell. Id. He then asserted that he returned to sick call on January 22 complaining of chest pain again, and was again sent back to his cell without receiving any treatment. Id. Finally, he alleged that he was sent to the SHU for 30 days just because he asked for medical help. See Docket No. 80-18. He claimed he was kept in the SHU with no medication for his heart condition and pain. Id.

On January 25, 2016; February 3 and 10, 2016; and March 25, 2016; Mr. Thompson submitted informal resolution requests (IRR) on prison forms contesting his disciplinary write-up. See Docket Nos. 80-16, 80-15, 80-14 & 80-13. Mr. Thompson's IRRs were investigated and rejected. See Docket No. 80-11, 80-10, 80-9 & 80-8. He then filed a request for administrative remedy (AR) on March 4, 2016; May 9, 17 and 25, 2016. See Docket No. 80-12, 80-6, 80-5 & 80-4.

Mr. Thompson filed his *pro se* complaint pursuant to 42 U.S.C. § 1983 on May 27, 2017. See Docket No. 1. Now pending is defendants' joint motion for summary judgment. See Docket No. 52. Defendants assert they are entitled to

qualified immunity on Mr. Thompson's claims because he cannot make out a constitutional violation. Id. Mr. Thompson argues that defendants are not entitled to qualified immunity. He also argues that, even if defendants are entitled to such immunity, that would only affect his claim for money damages. Mr. Thompson argues his claim for declaratory and injunctive relief survives defendants' motion for summary judgment because qualified immunity does not apply to such forms of relief.

## DISCUSSION

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met its

burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Fed. Practice & Procedure, § 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

Though *pro se* litigants like Mr. Thompson are entitled to a liberal construction of their pleadings, FED. R. CIV. P. 56 remains equally applicable to them. Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987). This includes the requirement that Mr. Thompson respond to defendants' "motion with

specific factual support for his claims to avoid summary judgment." Beck v. Skon, 253 F.3d 330, 333 (8th Cir. 2001). The district court is not required to "plumb the record in order to find a genuine issue of material fact." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed *pro se* in vindicating their constitutional rights, and [the Eight Circuit does] not approve summary dismissal of such *pro se* claims without regard for these special problems." Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." Ross v. Franzen, 777 F.2d 1216, 1219 (7th Cir. 1985).

The court notes that the recitation of the medical facts contained in this opinion was based solely on exhibits submitted by Mr. Thompson himself. Therefore, these documents form the best version of the facts available to Mr. Thompson for purposes of evaluating defendants' summary judgment motion.

**B. The Law of Qualified Immunity**

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Thompson must show (1) defendants acted under color or state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982). Qualified immunity is immunity from suit, not just a defense to liability at trial. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 536 (1991).

To determine whether an official may partake of qualified immunity, two factors must be determined: (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity if the answer to either of the Saucier prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " Stanton v. Sims, 571 U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 134 S. Ct. at 5. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright

lines.' " Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Hunter, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818). The Court held that a "firm application of the Federal Rules of Civil Procedure is fully warranted and may lead to the prompt disposition of insubstantial claims." Id. at 597 (quoting Harlow, 457 U.S. at 819-20, n.35 (quoting Butz v. Economou, 438 U.S. 478, 508 (1978))).

Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery." Crawford-El, 523 U.S. at 598. Even then, the Court has pointed out that FED. R. CIV. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id. Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence. Id.

As Mr. Thompson has correctly pointed out, the qualified immunity defense applies only to the individual capacity claims against defendants for money damages; it does not affect plaintiff's official capacity claims for declaratory and injunctive relief. Pearson v. Callahan, 555 U.S. 223, 242-43 (2009); Hafer v. Melo, 502 U.S. 21, 25 (1991); Grantham v. Trickey, 21 F.3d 289, 295 (8th Cir. 1994).

## C. Deliberate Indifference

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Allard v. Baldwin, 779 F.3d 768, 771 (8th Cir. 2015). That prohibition includes prison officials' deliberate indifference to the medical needs of inmates. Id. That is because "deliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05. "[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Id. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. Allegations of negligence are not enough to state a claim. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). Mr. Thompson is required to show (1) that he suffered objectively serious medical needs and (2) that defendants actually knew of but deliberately disregarded those needs. Id. (citing Coleman, 114 F.3d at 784).

"A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at 784. Here, defendants do not dispute that Mr. Thompson's heart and anxiety conditions were serious medical needs. The dispute centers on whether defendants knew of these needs and deliberately disregarded them.

To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). See Docket No. 7, at pages 6-7 (district court screening opinion). A plaintiff asserting deliberate indifference "must show more than even gross negligence"—he "must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.' " Allard, 779 F.3d at 771-72. A plaintiff can show deliberate indifference by demonstrating grossly incompetent or inadequate care; showing a defendant's decision to make a less efficacious and easier course of treatment; or demonstrating that a defendant denied access to or intentionally delayed medical care. Id. at 772.

Here, the medical records Mr. Thompson himself submitted as exhibits demonstrate that defendants were never deliberately indifferent to his serious medical needs. See Docket No. 80. Instead, at every turn, whenever Mr. Thompson complained of chest pain, anxiety, shortness of breath, difficulty swallowing, or constipation, he was thoroughly evaluated. Id. He was given medication, for both his physical and mental conditions, and prison staff attempted to make sure Mr. Thompson took his prescribed medication. Id. He

was given numerous EKGs. Id. He was referred to outside medical care providers on at least four occasions—January 18, 19 and 26, and February 5. Id. He received surgery for the installation of a pacemaker. Id. He received monitoring and adjusting of the settings on his pacemaker. Id.

There is zero evidence he suffered three heart attacks in the SHU and received no treatment or medical attention. The records from the period of time Mr. Thompson was in the SHU show he received almost daily medical attention.[8] While in the SHU, Mr. Thompson was seen on the following occasions:

| **Date of Visit** | **Time of Visit** | **Citation to the Record** |
|---|---|---|
| 01-24-16 | 4:58 p.m. | Docket No. 80 at pp. 40 & 39. |
| 01-24-16 | 8:17 p.m. | Docket No. 80 at p. 40 |
| 01-26-16 | 11:24 a.m. | Docket No. 80 at pp. 49 & 42. |
| 01-26-16 | 1:20 p.m. | Docket No. 80 at pp. 42 & 41. |
| 01-26-16 | (Avera Hosp ER) | Docket No. 80 at p. 43. |
| 01-29-16 | 9:55 a.m. | Docket No. 80 at p. 50. |
| 01-29-16 | 11:24 a.m. | Docket No. 80 at p. 51. |
| 01-31-16 | 12:30 p.m. | Docket No. 80 at p. 51. |
| 01-31-16 | 2:55 p.m. | Docket No. 80 at p. 52. |
| 02-05-16 | 10:00 a.m. | Docket No. 53-23 |
| 02-08-16 | 2:29 p.m. | Docket No. 80 at p. 55. |
| 02-08-16 | 4:16 p.m. | Docket No. 80 at p. 57. |

When Mr. Thompson was seen at Avera Sacred Heart Hospital on January 26, 2016, they interrogated his pacemaker for data about his heart activity and found

[8] Mr. Thompson was in the SHU from January 22 to March 22, 2016.

no evidence of any untoward cardiac events since the device had been installed. See Docket No. 80 at p. 44.

Mr. Thompson added his own hand-written notations on his medical records. For example, on the January 18, 2016, record documenting that Mr. Thompson was transferred to the emergency room at Avera Sacred Heart Hospital after he complained of dizziness, Mr. Thompson wrote "Plaintiff fell over." See Docket No. 80 at p. 31. The court takes Mr. Thompson's handwritten interjection to be an indication he thinks the medical records are inaccurate. Even so, Mr. Thompson's notation only goes to the issue of how severe his symptoms were—it does not negate the fact that prison medical personnel acted rapidly and responsibly to Mr. Thompson's condition by running an EKG, sending the EKG to Avera and sending Mr. Thompson to the emergency room. See Docket No. 80 at pp. 32-33.

Similarly, on the January 21, 2016, medical record, the record itself shows Mr. Thompson reported to medical because he was feeling "really dizzy" and felt his heart started going too fast. See Docket No. 80 at p. 37. The record itself stated that Mr. Thompson denied having shortness of breath or chest pain. Id. Mr. Thompson's hand-written notation on this record is that the video camera in the prison showing Mr. Thompson walking to the desk will show he was in distress. Id. Again, this goes to how severe Mr. Thompson's symptoms were, but does not negate the fact defendants took his complaints seriously and evaluated him medically. On this occasion, defendants took Mr. Thompson's vital signs, which were normal. They also obtained a verbal order from M. Hanvey PAC which

allowed Mr. Thompson to stay in his bed for three days and have meals delivered to him. Id.

The court finds Mr. Thompson's Eighth Amendment rights were never violated. There is no genuine issue of material fact about this issue. The record before the court demonstrates that, at every turn, defendants took Mr. Thompson's medical conditions seriously and provided appropriate treatment therefor. Accordingly, the court recommends summary judgment be granted on Mr. Thompson's deliberate indifference claim.

This recommendation is that the entirety of Mr. Thompson's Eighth Amendment claim be dismissed, even that portion for which he seeks only declaratory and injunctive relief. Declaratory and injunctive relief are not affected by the defense of qualified immunity. But because this court concludes qualified immunity applies because no constitutional violation was demonstrated, that conclusion also serves to defeat Mr. Thompson's claims for declaratory and injunctive relief.[9]

**D. Retaliatory Discipline**

"A prisoner's Eighth Amendment rights are violated if prison officials 'impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right.' " Meuir v. Greene County Jail Employees, 487 F.3d

[9] In addition, claims for declaratory and injunctive relief are rendered moot when a prisoner is released or transferred to another facility. See Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999) (discussing Hickman v. Missouri, 144 F.3d 1141, 1142 (8th Cir. 1998); and Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985)). This is true even if the prisoner argues he might, at some future time, be reincarcerated at the same prison. Smith, 190 F.3d at 855. Here, the events for which Mr. Thompson seeks declaratory and injunctive relief occurred at MDSP, but Mr. Thompson has subsequently been transferred to SDSP. Therefore, his claims for declaratory and injunctive relief are moot.

1115, 1119 (8th Cir. 2007). See also Haynes v. Stephenson, 588 F.3d 1152, 115 (8th Cir. 2009). A *prima facie* case of retaliatory discipline requires a plaintiff to show (1) that he exercised a constitutionally protected right, (2) that he was subsequently disciplined by prison officials, and (3) the motive for imposing the discipline was the exercise of the constitutional right. Id.

The third element of the *prima facie* case requires the plaintiff to show that, "but for" the retaliatory motive, the disciplinary action would not have been taken. Haynes, 588 F.3d at 1156. The "but for" test applies to the defendants' motive, not to causation. Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012). The "causal connection is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." Beaulieu, 690 F.3d at 1025. Where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation. Haynes, 588 F.3d at 1156-57. A span of three days between the alleged retaliation and the conclusion of the plaintiff's exercise of his constitutional rights was a sufficiently close nexus in time to stave off summary judgment. Santiago v. Blair, 707 F.3d 984, 993 (8th Cir. 2013). Where the allegedly retaliatory action takes place *before* a defendant knows that the plaintiff exercised a constitutional right, summary judgment in favor of the defendant is appropriate. Beaulieu, 690 F.3d at 1025-26.

It is the prisoner's burden to prove "that but for an unconstitutional, retaliatory motive the [discipline] would not have occurred." Sisneros v. Nix, 95 F.3d 749, 752 (8th Cir. 1996). "[I]nmate claims of unlawful retaliation must be

treated with skepticism because'[e]very act of discipline . . . is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct.' " Id.

In Meuir, the plaintiff had bleeding gums and toothaches for which he sought medicated mouthwash. Meuir, 487 F.3d at 1117. Defendants refused to provide the mouthwash, but instead gave him Tylenol and urged him to rinse his mouth with salt water. Id. After plaintiff's dental complaints continued, a visit to an outside dentist was scheduled; however, fearing that the dentist would pull all his teeth, the plaintiff refused to go. Id. at 1117-18. Thereafter, the jail officials refused to give the plaintiff free Tylenol for his toothaches, although the plaintiff could still obtain Tylenol from the commissary at his own expense. Id. at 1118. The plaintiff brought suit, alleging retaliatory discipline. Id. The case was dismissed on defendant's rationale that plaintiff's refusal to go to the dentist convinced defendants that his dental condition was not that serious after all. Id. at 1119.

In Haynes, a prisoner filed a grievance against a prison employee alleging the employee cursed at the prisoner and threatened him. Haynes, 588 F.3d at 1155. The employee responded by filing a disciplinary charge against the prisoner, alleging that the prisoner had filed a grievance on false charges. Id. This prompted prison officials to transfer the prisoner from his normal cell to a mosquito-infested, hot and humid cell where he received reduced shower and exercise privileges and could not visit the prison library. Id. The prisoner then filed a retaliatory discipline claim in court. Id. Defendants in the lawsuit argued that transfers to different cells did not constitute discipline, negating the second

element of the *prima facie* case. Id. The court held that the filing of the disciplinary charge itself was sufficient to satisfy the second element. Id. at 1156.

In Cornell v. Woods, 69 F.3d 1383, 1386-88 (8th Cir. 1995), prison officials filed a disciplinary charge against a prisoner and the prisoner was transferred to a higher-security prison after he had cooperated with an internal affairs investigation at his prison implicating a prison guard. The prisoner then brought suit under § 1983 alleging that the defendants had disciplined him in retaliation for exercising his constitutional right to cooperate with the IA investigation. Id. at 1387. Although the court acknowledged that prisoners have no right to remain in a particular prison, and that prison officials may transfer a prisoner for any reason or no reason, the court held that defendants could not transfer a prisoner in retaliation for exercising a constitutional right. Id. at 1387-88. The court held that the plaintiff had a constitutional right to cooperate with the internal prison investigation. Id. at 1388. If the cooperation in the investigation was the "but for" reason for the plaintiff's transfer to the more-secure prison, plaintiff made out a *prima facie* case of retaliatory discipline. Id. at 1388-89. If, however, the discipline or transfer was made because of "an actual violation of prison rules or regulations, then" the retaliatory discipline claim fails. Id. at 1389; Santiago, 707 F.3d at 993.

Where a plaintiff engaged in behavioral infractions nine times in the month immediately preceding his transfer, and where transfers were appropriate to address behavioral problems, the plaintiff failed to prove that his exercise of his constitutional right was a "but for" cause of the transfer. Beaulieu, 690 F.3d at 1026-27.

Here, Mr. Thompson's penalty, placing him in the SHU, was imposed three days after he received his pacemaker surgery and following numerous visits to medical staff following that surgery. It would seem, then, that the penalty was meted out close in time to Mr. Thompson's exercise of his constitutional right—his right to seek appropriate medical care. But this temporal connection is not as close as it might seem at first glance. This is because Mr. Thompson more or less *constantly* sought out medical care, both before and after being placed in the SHU. If defendants wanted to retaliate against Mr. Thompson for seeking medical care, why would they have waited until January 22 to do so? Mr. Thompson had been seen by medical staff October 21, 2015 (twice); October 30, 2015; November 7, 16, 17, 18, 19, 23, and 30, 2015; December 3, 4, 7, and 10, 2015; and January 14, 15, 16, and 17, 2016. See Docket No. 80 at pp. 1-31.

In addition, Mr. Thompson was seen multiple times, including twice by outside medical care providers, when he was in the SHU. See Docket No. 80 at pp. 39-57; Docket No. 53-23. When one takes the longitudinal view of the evidence in this case, the January 22 disciplinary measures do not show a close temporal connection to Mr. Thompson's exercise of his constitutional right to seek medical care. He was not punished in late 2015, despite numerous medical visits. And he was not punished while in the SHU, as he continued to receive more or less constant medical visits.

Here, Mr. Thompson adduces no other direct or circumstantial evidence tending to show defendants had a retaliatory motive. No defendant or prison employee made any suggestive comments to that effect. There is no "smoking gun" written document in the administrative grievances filed by Mr. Thompson.

In the Eighth Amendment context, it matters whether a defendant meted out punishment to a prisoner for punitive or retributive reasons. Cornell, 69 F.3d at 1387-88 (although prisoner had no right not to be transferred, defendants could not transfer prisoner in retaliation for exercising a constitutional right). Here, there is no evidence, direct or circumstantial, tending to show such a motive.

The "causal connection [between a discipline meted out and the previous exercise of a constitutional right] is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." Beaulieu, 690 F.3d at 1025. Where evidence of causation is completely lacking, summary judgment is appropriate. Sisneros, 95 F.3d at 752-53.

Timing in this regard is extremely important: where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation. Santiago, 707 F.3d at 993; Haynes, 588 F.3d at 1156-57. Alternatively, where the allegedly retaliatory action takes place *before* a defendant even knows that the plaintiff exercised a constitutional right, summary judgment in favor of the defendant is appropriate. Beaulieu, 690 F.3d at 1025-26. Here, defendants disciplined Mr. Thompson in the middle of an ongoing pattern of medical attention-seeking by Mr. Thompson. Mr. Thompson's inclination to seek out medical attention occurred long before the discipline and continued long after.

Because Mr. Thompson's seeking of medical attention was so proliferous, the timing of his discipline does not give rise to an inference of retaliation. Without something more to create such an inference, there is nothing upon which

the court can conclude defendants' motivation was illegal retaliation. As such, the court concludes Mr. Thompson has not proven that there is a genuine issue of material fact regarding his Eighth Amendment retaliation claim. For that reason, the court recommends granting defendants summary judgment on this claim. As with Mr. Thompson's deliberate indifference claim, the fact that Mr. Thompson has failed to show a constitutional violation defeats both his claim for damages as well as his claims for declaratory and injunctive relief.[10]

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends granting defendants' motion for summary judgment [Docket No. 52] and denying as moot the parties' other pending motions [Docket Nos. 68, 77, 79, 81 and 85].

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED August 18, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

[10] As noted above in footnote 9, that relief has also been rendered moot by Mr. Thompson's transfer to SDSP because the events about which he complains took place at MDSP, not SDSP.